Adolph Merkle, Plaintiff-Appellee, v. Roy Kegerreis, Defendant-Appellant.

Gen. No. 10,637.

Opinion filed April 20, 1953. Released for publication May 12, 1953.

HOWARD E. SMITH, of Geneva, and J. ROBERT MURPHY, of Aurora, for appellant; HOWARD E. SMITH, and HOWARD E. SMITH, JR., both of Geneva, and J. ROBERT MURPHY, of Aurora, of counsel.

PAULSON, MORGAN & JORDAN, of Elgin, for appellee; W. BEN MORGAN, and HAROLD H. JORDAN, both of Elgin, of counsel.

MR. PRESIDING JUSTICE DOVE delivered the opinion of the court.

Adolph Merkle filed this action in the circuit court of Kane county against the defendant, Roy Kegerreis, a physician and surgeon, specializing in X-ray diagnosis and treatment, to recover damages resulting from personal injuries sustained by him on account of the alleged negligence of the defendant in removing a plantar wart from the ball of plaintiff's foot by the administration of an X-ray treatment. The defendant filed his answer in which he denied the negligence charged and a trial was had before the court, without a jury. At the conclusion of the trial on November 15, 1951, the court took the cause under advisement and on November 28, 1951, rendered judgment in favor of the plaintiff and against the defendant for $10,000.

The following day the defendant filed a motion for a new trial. The principal grounds of this motion were that the court had admitted incompetent evidence of-

104

fered by the plaintiff at the trial and had refused to admit competent evidence offered by the defendant and that the judgment was excessive.

On February 15, 1952, additional specifications to his motion for a new trial were filed by the defendant and in support thereof an affidavit of the official court reporter who took in shorthand the testimony of the several witnesses who testified upon the trial and an affidavit of one of the three attorneys who represented the defendant at the trial were filed.

The affidavit of the official court reporter recited that he, in his official capacity, took complete shorthand notes of the testimony in this case; that he last saw these complete notes about two days after the trial and that they were then in the usual place for keeping such notes. He further stated that he looked again for them on February 1, 1952, after having been requested to furnish a transcript of the testimony to defendant's attorneys and found part of the notes were missing; that he then made a thorough search for them and could not find them and that he does not now know where they are and has no way of supplying the lost parts. The defendant's attorney stated in his affidavit that neither he nor the other counsel representing the defendant who participated in the trial made any notes during the trial of sufficient extent, detail or definiteness to enable them to supply the missing parts of the testimony presented during the trial; that much of the missing testimony was of a technical and medical nature, which makes it impossible to stipulate to its content.

The court reporter's affidavit discloses that he still possessed his notes of all of the testimony of the defendant when he was called for adverse examination under section 60 of the Practice Act [Ill. Rev. Stats. 1951, ch. 110, § 184; Jones Ill. Stats. Ann. 104.060] and had his notes of all of the testimony of Gordon

W. Abbott, and of Loretta Merkle, two of the plaintiff's witnesses: that a portion of his notes of the testimony of the plaintiff on direct examination and a portion of his notes of his cross-examination, were missing but he had his complete notes of his re-direct and his re-cross-examination; that he has his notes of a portion of the testimony of Paul G. Tobin (another witness for the plaintiff) on direct examination but none of his cross, re-direct or re-cross-examination; that a large part of his notes of the direct examination of the defendant when he took the stand in his own behalf, and all of his notes of his cross, re-direct and re-cross-examination were lost.

Upon a hearing the trial court, on April 9, 1952, denied the defendant's motion for a new trial. On June 30, 1952, counsel for defendant presented to the trial court a report of proceedings consisting of 93 pages being a transcription of all the notes of the testimony which had not been lost or misplaced and which transcript had been prepared by the official court reporter. The record discloses that at this time counsel for defendant, addressing the court said: "This comes on for hearing on notice for presenting a report of proceedings for certification by your Honor. Counsel for appellee and myself agree that this report, from the available record is not complete and that neither your Honor nor the court reporter can certify that it is complete because it is not complete. Having discussed with counsel for appellee what we have to do next, it appears to me that the only possible thing is for the court to call back the witnesses who testified on the original hearing, to supply the matters that are omitted from the incomplete report of proceedings. I am relying on the many cases which state that under the Practice Act it is the duty of the court in the case where an incomplete report of proceedings is presented, which he cannot certify, to make up and

106

settle the report of proceedings which he can, in his own discretion, certify. All we ask is that the court find for itself a correct report of proceedings and we have no alternative but to rely on the report that the court certifies and that is a judicial trust placed on the trial judge and no one but the trial judge can do it. . . . Under the circumstances we must ask the court to call in the witnesses and ask them what they said or what they know about the case so we may have a complete report of proceedings. We have presented to your Honor this morning all that we have in the nature of a report and this is the transcript provided by the court reporter and the affidavit of the court reporter fully sets out what parts are missing." The court stated that it would be utterly impossible to reproduce this record and suggested that the parties agree on a narrative form of statement of the missing evidence but the parties did not accept the suggestions and the trial court certified to the report of proceedings as presented by counsel for appellant to the effect that "the foregoing report of proceedings is a true and correct report of proceedings in part but does not contain all the evidence heard and received at said hearing."

The record discloses that upon the trial of this case five witnesses testified. The first witness was the defendant, called by the plaintiff under section 60 of the Practice Act. All of his testimony upon this examination is in the record. The plaintiff then testified in his own behalf and some 25 typewritten pages of his direct, cross, re-direct and re-cross-examination appears in the record but some of his re-direct and re-cross-examination according to the affidavit of the court reporter, has been lost. The next witness for the plaintiff was Dr. Gordon W. Abbott, who testified that he was the family physician of the plaintiff and had

been for many years. He further testified that he was consulted by the plaintiff in February or March 1949 following the X-ray treatment administered by the defendant on January 26, 1949. All of Dr. Abbott's direct, cross, re-direct and re-cross-examination is found in the record. Dr. Paul G. Tobin, was called as a witness for the plaintiff and he testified that he was the surgeon who operated upon the plaintiff in the spring of 1951 at which time Dr. Abbott was present. He stated that he removed the large toe, second toe, the entire distal third of the first metatarsal and also the medial half of the metatarsal together with involved skin tissue and other subcutaneous tissue and muscle of plaintiff's left foot. Some eight pages of the testimony of this witness appears in the record. The wife of the plaintiff was the only other witness called by the plaintiff and all of her testimony appears in the record.

When called by the plaintiff under section 60 of the Practice Act the testimony of the defendant, as abstracted by his counsel, is as follows: "My name is Roy Kegerreis, I live at Elmhurst, Illinois. I am a physician and surgeon, regularly licensed by the State of Illinois since 1930. I specialize in the branch of my profession known as radiology, meaning that I administer X-ray treatments. In January, 1949, I was associated with and on the staff of St. Joseph's Hospital in the City of Elgin, in the capacity of roentgenologist. I performed X-ray treatments at the hospital and held myself out to the public as a roentgenologist and as an expert in that line. I had given Adolph Merkle an X-ray treatment once about 14 months previous to January 26, 1949. On January 26, 1949, I treated him for a plantar wart, located on the ball of the left foot on the side towards the big toe. Plantar is the Latin name for the sole of the foot. The wart was about

half an inch in diameter with some smaller warts aside of it. The area treated was half an inch by an inch.

"I treated him in the X-ray department of the hospital. He came to me up at the hospital, and prior to that time I had not seen him for about 14 months. The X-ray machine has an aperture and you put a shield over the foot so as to expose the region, in this case half an inch by one inch, and the X-rays were put on there, 1225 units; we call them roentgens. The patient was lying on a table with the sole of the foot exposed toward the rays. I am not sure whether he was lying on his back. His foot was held in place by the lead shield we put on it, and usually also with sandbags or bricks. The shield covered the foot except for the area treated. The side is exposed; the X-rays came from one direction. The machine was pointed towards the sole of the foot. He was lying on a table with his foot up on it, much as the manner you are in now. The X-ray machine hasn't a lens, it just has an opening. The machine was made by Standard X-Ray Company in Chicago. I always adjust the patient and the machine, and I did in this case, placing his foot in position in front of the machine. I then started the machine working. It is possible to regulate the strength of the rays by adjusting the machine. The current is kept at a constant—the voltage is varied. If the voltage were too high you would get more X-rays than you wanted. The result might be too much radiation on the flesh; in the parlance of the language that is called an X-ray burn. I do not remember independently how long this patient's foot was exposed, but I looked at the report and the entry in the book. I would, without an independent recollection, estimate that it was seven minutes. If the machine were left on too long it would not produce exactly the same results as if the current were too strong. It would cause a burn if it was left on too long, or if the voltage was too strong. At the

time I administered this treatment, I examined the machine and it was in good working order. After the treatment was over, I gave the patient a certain amount of opinion and instruction. He then put on his shoe and walked away.

"The X-rays were administered for the purpose of removing the wart, but it would not remove it instantly, —it would deteriorate and fall away, the height of the reaction being reached in 10 days or two weeks. If the machine were properly used and the treatment carefully and properly administered, the X-ray treatment would not be the cause of a deterioration of the foot to such an extent that it would have to be partially amputated. On the 14th of February Mr. Merkle called on me; he phoned me on the 11th of February, and I saw him again on the 14th of February. Both times that I saw him it was at the hospital—he came back as per instructions to have me look at it. In the telephone conversation he said it was yet very sore, and I assured him that that was a normal reaction and would decrease in soreness with time. When he saw me three days later it had decreased a little bit and the soreness was going out. At that time I wrote: There is marked reaction, seems to be subsiding, treated area peeling off. That is, the fever is going out of it. Hot boric acid solution for 20 minutes twice a day, and he could trim off the thick part if he wished —that was my instruction the last time I saw him, which was in the hospital.

"That time at the hospital I did not tell him I was through with the case nor to see his family physician and let him take care of it. In March, over a year later, at the suggestion of Doctor Abbott, I saw him at his home, and I told him then that he was under the care of his family physician and not me. I saw his foot then, in March, and it was very bad. The bones were exposed. You could see the bones down in the

110

wound. That was March, 1950, a year later, when I saw him in his home. He was sitting on a chair as I recall. The flesh between the big toe and the second toe was gone and the bones were exposed. The ball of the foot and the surrounding structures in the toes were inflamed. The region that was treated was not wasted away. The inflamed area was approximately between half an inch and an inch away from the treated area. I have not seen him since March, 1950, but at that time the patient told me he had been advised by someone that he would have to have his foot amputated. I felt that wasn't necessary and told him it was my judgment they shouldn't take off the foot."

When called as a witness in his own behalf the defendant testified, as abstracted by his counsel: "My name is Roy Kegerreis, I reside at Elmhurst, Illinois, I am a physician and surgeon and have been practicing medicine since 1930. I am a graduate of Rush Medical College and have degrees from Ohio State University, Iowa University and the University of Michigan. In 1949 I was roentgenologist at St. Joseph's Hospital and received a salary for my services. I am no longer connected with them, as I am in private practice and also work for the State of Illinois Welfare Department a day and half a week as consultant. I specialize in X-ray diagnosis and treatment, and have specialized in that line since I began practicing. I know Mr. Merkle, the plaintiff. About a year or more prior to 1949 I removed a plantar wart from his foot. In January 26, 1949, I removed a plantar wart from his foot. I placed a lead shield over the foot, except a region approximately 1½ inches by one inch. The largest wart was approximately one-half inch in diameter. The lead plate covered all of the sole of the foot except where the warts were. This lead plate is the usual and customary plate used by radiologists. The machine is one built by Standard X-Ray Company in

Chicago and was in perfect working order at the time, and is still in operation at St. Joseph's Hospital. The plaintiff was in my office probably a total of 15 minutes. The X-ray was applied for seven minutes. I was there at the time, but when we give treatments no one stays in the room with the patient—we have a window in the door through which they are observed. This is the usual and customary method in treatments of that kind. After the patient left, I saw him twice, according to my notations in the record. These records are in my handwriting, and show where the plantar wart was located at the time I made the diagnosis."

The Practice Act provides that the Supreme Court may, by general rules, regulate and determine the practice and procedure by which cases shall be reviewed in this court, including the form and contents of the record and all other matters of practice in connection with the review of cases (Ill. Rev. Stat. 1951, chap. 110, par. 203, sec. 79 [Jones Ill. Stats. Ann. 104.079]). Rule 36 (1-c) provides that the proceedings at the trial, consisting of the testimony and the rulings of the trial judge and all matters upon which such rulings were made and other proceedings which the appellant desires to incorporate in the record on appeal, shall be procured by the appellant and submitted to the trial judge for his certificate of correctness (Ill. Rev. Stat. 1951, chap. 110, par. 259.36 (1-c) [Jones Ill. Stats. Ann. 105.36, subd. 1-c]). The preceding paragraph (1-b) of the same rule provides that all parts of the record on appeal so designated by the praecipe shall be incorporated in the record by copies certified by the clerk "Provided, however, that the original copy of the report of proceedings at the trial, as certified by the trial judge, whether in the form of a complete stenographer's report or a condensed statement . . . may be incorporated in the record on appeal by order of the court or by stipulation of the

parties." (Ill. Rev. Stat. 1951, chap. 110, sec. 259.36 (1–b) [Jones Ill. Stats. Ann. 105.36, subd. 1–b].)

In the instant case, at the time the trial judge certified to the report of proceedings at the trial, counsel for appellant stated that the hearing was upon notice for presenting a report of proceedings for certification; that the report presented was not complete, and counsel requested the court "to call in the witnesses and ask them what they said or what they know about the case so we may have a complete report of proceedings." The trial court did not call in the witness but did certify to the report in accordance with the request of counsel for appellant, as heretofore set forth. Under our rules of practice, it was defendant's duty to present to the trial court a report of proceedings either in the form of a complete stenographer's report or a condensed statement in narrative form. This report should have contained the complete stenographer's report of the proceedings at the trial or a condensed statement thereof or, under the circumstances shown by this record, a stenographer's report of the proceedings so far as obtainable and a narration of the portion which had been lost. When presented to the court, it should have contained the substance of the missing testimony as defendant understood it to be. What defendant did do was to present to the court an incomplete report with three requests: first, for its certification; second, that the court call in the several witnesses; and, third; that the court ask the several witnesses "what they know about the case."

 The trial court complied with the first request and certified to the report of proceedings as presented but declined to call in the witnesses and interrogate them. In so doing, the trial court did not err. In the early case of *Rogers v. Hall*, 4 Ill. (3 Scam.) 6, the court referred to the nineteenth section of the Practice Act, which then provided that if either party, in the

progress of a trial, shall allege any exception to the decision of the court, and shall reduce the same to writing, the judge shall sign and seal the same. The opinion then said: "By this act, it is apparent that the bill of exceptions is not to be considered as a writing of the judge, but is to be esteemed as a pleading of the party alleging the exception, and if liable to the charge of ambiguity, uncertainty, or omission, it ought, like any other pleading, to be construed most strongly against the party who prepared it. The appellant must be responsible for all uncertainty and omission in his bill of exceptions; because he could and ought, to have written out the evidence truly and according to the fact."

An examination of this record convinces us that if there was anything defendant desired incorporated in the report of trial proceedings which any of the several witnesses testified to and which does not appear therein, the defendant was in a position to supply it in narrative form and, thus, save for review every vital question presented to the trial court. The defendant was the sole witness in his own behalf, and as to his evidence, the record shows that he testified at great length. All of his testimony when called as a witness for cross-examination, under section 60 of the Practice Act, and portions of his direct, cross and re-direct examination when called as a witness on his own behalf appear in the incomplete report of trial proceedings. All of the testimony of Dr. Abbott, plaintiff's family physician, and all of the testimony of the wife of the plaintiff appear in the record. The report of trial proceedings also includes the testimony of Doctor Tobin, the surgeon who operated upon the plaintiff. He testified fully as to the condition of appellee's foot and the nature of the operation he performed. Substantial portions of the testimony of three of the witnesses who testified and all the testimony of the other two witnesses are found in this record.

114

 Without any attempt on the part of the defendant to supply the substance of the missing testimony, the trial court, who tried the case without a jury, was asked to grant a new trial simply because counsel for appellant did not make any notes during the trial "of sufficient extent, detail or definiteness" to enable them to supply the missing portions of the testimony. It does not follow that simply because the court reporter lost some of his shorthand notes that no complete report of the proceedings at the trial could have been presented to the trial court for certification.

In *Moore v. State of Oklahoma,* 59 Okla. Cr. 372, 61 P. (2d) 1134, 107 A. L. R. 598, the plaintiff in error had been convicted of murder and sentenced to life imprisonment. It appeared in that case that the stenographer who took the testimony at the trial died before transcribing his notes, and by reason thereof the defendant was prevented from having a literal transcript of the testimony of the witnesses and the proceedings at the trial. The court held that where it appeared that a substantially correct statement of the testimony and proceedings could be prepared, defendant was not entitled to a new trial. In so holding, the court, in its opinion, cited numerous cases and stated that it was impossible to harmonize the authorities but that the general rule appeared to be that if a party has lost the benefit of his exceptions from causes beyond his control a new trial should be granted, but the inability of an appellant to procure a transcript of the testimony was not grounds for a new trial if the lost or destroyed record can be substituted or if a statement of the evidence in lieu of the transcript can be made. Among the cases cited was *Elliott v. State,* 5 Okla. Cr. 63, 113 Pac. 213, where a new trial was granted because the court reporter lost a part of his notes and was unable to supply a complete transcript. The court also cited *Dobbs v. State,* 5 Okla. Cr. 475, 114 Pac. 358, 360, 115 Pac. 370, and quoted therefrom

115

as follows: "The mere fact that a stenographer may have lost his notes or that they may have been stolen from him, would not constitute a valid excuse for a failure on the part of the appellant to prepare and serve a case-made. If it did, every judgment entered by any court of record would be at the mercy of the carelessness and dishonesty of the court stenographer. While the stenographer's notes of the testimony constitute the most convenient means of preparing a case-made, yet they are not the only source from which a case-made may be prepared. Even when a case-made is prepared from the stenographer's notes of the testimony, it must still be approved by the judge who tried the case, and he is not bound by such notes, but must still see that the case-made speaks the truth, and he may correct such case-made from memory or from any source that may be satisfactory to him." The court also quoted from *Thornsberry v. State,* 8 Okla. Cr. 88, 126 Pac. 590, which held: "The fact that a stenographer's notes may have been lost or stolen will not excuse the failure of appellant to incorporate the testimony upon his trial in the case-made, and cannot be considered as ground for a new trial." The court also quoted from the opinion of MR. JUSTICE FURMAN in *Harris v. State,* 10 Okla. Cr. 417, 137 Pac. 365, 369, 139 Pac. 846, where a reversal was sought because of the inability of the plaintiff in error to procure a transcript of the testimony. Said JUSTICE FURMAN: "The writer of this opinion practiced law many years in Texas before court stenographers were known in that State, and when, under the law, the evidence had to be written out as a matter of memory by the attorney and filed in court within ten days from the adjournment of the term of court. The writer never had the least difficulty in preparing his statements of the evidence in his cases, and he knows from personal experience that it can easily be done. In fact he seriously doubts if the employment

116

of court stenographers is at all necessary either in the administration of justice or to the development of lawyers. It has a tendency to breed carelessness on their part. . . ." The court also quoted from *Butts v. Anderson,* 19 Okla. 367, 91 Pac. 906, 908, in which case it appeared that subsequent to the trial and before the record on appeal had been prepared, the court stenographer died. The trial court set aside the judgment, and in reversing that order, the Supreme Court said: "The cause upon and for which the court set aside its judgment was that after the trial, and after the judgment had been rendered, the court stenographer who took the short-hand notes of the trial had died, and the defendants, desiring to appeal the case, could find no one who could transcribe the shorthand notes of the deceased stenographer. We know of no law, nor have we been advised of any, which empowers the court to grant a new trial because of the inability of the judgment debtor to procure his record or prosecute his appeal. The law provides that a party desiring to take an appeal will prepare a case, setting out substantially so much of the record as will make apparent the errors relied upon, and the service of his prepared case upon the adverse party, who may, if not satisfied with its contents, propose such amendments as he may deem necessary and upon proper notice by either party the court will settle the case. Upon such a case he may file his petition in error and have the judgment complained of reviewed by the appellate court. While the law contemplates that either party may have the stenographer to transcribe his shorthand notes, upon payment of the necessary fees therefor, it does not contemplate that such is the only method of preparing a record for a case-made." (For annotations upon the question of inability of an appellant to perfect his record on appeal as ground for a new trial, see 13 A. L. R. 102; 16 A. L. R. 1158; and 107 A. L. R. 603.)

In *Alley v. McCabe*, 147 Ill. 410, it appeared that appellant was unable to furnish a bill of exceptions because the trial judge died before the time expired for filing the bill of exceptions. In affirming the judgment of the Appellate Court which affirmed the judgment of the trial court, our Supreme Court refused to follow a Maryland case which held that a party without laches on his part loses the benefits of his bill of exception by the death or illness of a judge, so that he cannot get his exceptions signed and sealed, is entitled to a new trial notwithstanding the lapse of considerable time. In the course of its opinion, it was said (p. 415): "We do not understand that the Appellate Courts of this State, or this court, is vested with power to grant new trials merely for the purpose of relieving a party of hardship resulting from some defect in the record, even though he is chargeable with no omission of duty or negligence whatever. On Appeals and writs of error these courts sit merely for the purpose of reviewing the record upon errors properly assigned, and reverse and remand cases to be retried only when it is shown that error was committed in the former trial. . . . All presumptions are in favor of fairness, impartiality and regularity of the proceedings of the trial court. The party in whose favor the judgment has been rendered is, on appeal or writ of error, entitled to the benefit of those presumptions, and yet this rule deprives him of his judgment, and sends him back to the trial court to re-establish his claim, because, as is said, his adversary has been, without his fault, deprived of the means of pointing out errors which are said to have been committed on the former trial. Conceding that appellant could not, by any means, have relieved himself of the hardship resulting from the death of JUDGE DRIGGS (the trial judge), we can see no good reason or justice in transferring that hardship to appellee."

 In the instant case, before it was known that a complete transcript of the testimony could not be furnished by the court reporter, the only grounds set forth in defendant's motion for a new trial was that the trial court had admitted incompetent evidence offered by the plaintiff and had refused to admit competent evidence offered by the defendant and that the judgment was excessive. As stated, the cause was heard by the court without a jury, and if incompetent evidence was admitted, it is presumed the trial court disregarded it in arriving at its judgment. If the trial court refused to admit any competent evidence offered by defendant, what that evidence may have been has not been pointed out to this court. Certainly the defendant, sole witness in his own behalf, should have been able to have furnished the trial court with the substance of that offered evidence.

 There is ample evidence in this record to sustain the findings and judgment of the trial court both on the question of liability and upon the amount of damages awarded the plaintiff. While, as pointed out by the trial judge, it is unfortunate that a portion of the shorthand notes of the official court reporter cannot be found, such fact would not have justified the trial court to have awarded the defendant a new trial. Upon the record here presented, the trial court did not err in refusing to sustain defendant's motion for a new trial.

The judgment of the circuit court of Kane county is affirmed.

*Judgment affirmed.*